IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 13, 2009 Session

**STEPHANIE D. HILL**
**v.**
**CITY OF GERMANTOWN, TENNESSEE; GERMANTOWN**
**POLICE DEPARTMENT; BOARD OF MAYOR AND ALDERMAN**
**OF THE CITY OF GERMANTOWN, TENNESSEE**

**An Appeal from the Chancery Court for Shelby County**
**No. CH-07-1858-2     Arnold B. Goldin, Chancellor**

_____

**No. W2009-00308-COA-R3-CV - Filed March 31, 2010**

_____

This appeal involves the termination of a municipal police officer. The housemate of the petitioner police officer accidentally damaged the police officer's take-home police vehicle. Although the police officer suspected that her housemate caused the damage, the police officer nevertheless filed accident and insurance loss reports indicating that the damage was caused by an unknown driver. About two months later, the police officer and her housemate had a tumultuous break up. After that, the police officer's supervisor discovered that the damage to the police vehicle may have been caused by the housemate. After an internal affairs investigation, the police officer was charged with violating police department rules regarding neglect of duty and lack of truthfulness. After a hearing before the municipal board, the police officer was found to have violated these rules and her employment was terminated. The city administrator upheld the termination. The police officer then filed the instant petition for writ of certiorari, challenging the administrative decision. The trial court granted the petition, holding that the termination of the police officer's employment was not supported by material evidence and, therefore, was arbitrary and capricious. The city now appeals. We reverse, finding that material evidence supported the administrative decision to terminate the police officer's employment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Edward J. McKenney, Jr., Memphis, Tennessee, for the appellants, City of Germantown, Tennessee; Germantown Police Department; Board of Mayor and Aldermen of the City of Germantown, Tennessee.

Wendy S. Dabbous, Jessica May Thomas, and Clyde Keenan, Memphis, Tennessee, for the appellee, Stephanie D. Hill.

## OPINION

### FACTS AND PROCEEDINGS BELOW

#### *Background*

From February 1997 until July 25, 2007, Petitioner/Appellee Stephanie Hill ("Hill") served as a police officer for the City of Germantown. At the time of the events in this case, Hill was working in the Investigative Unit of the Germantown Police Department. In the course of her employment, Hill was assigned a five-year-old Ford Taurus as a "take-home" vehicle. For several years prior to the termination of her employment, Hill lived with Ms Jamie Baker ("Baker") and Baker's children in a home owned by Baker in Collierville, Tennessee.

On January 19, 2007, Baker left the house before Hill did to take her children to school, driving her Ford Expedition SUV. Around 7:30 a.m., as Hill walked toward her take-home vehicle in the driveway to leave for work, she noticed damage to the back of the vehicle just to the left of the license plate. As she drove to work, Hill spoke with Baker twice on her cell phone and told Baker that she had damage to her car. Their exchange during that conversation became a subject of dispute, but it involved some discussion of whether Baker had hit Hill's take-home police vehicle. On a previous occasion, Baker had hit another of Hill's vehicles and did not immediately tell her.

When Hill arrived at work, she reported the damage to her take-home vehicle to her immediate supervisor, Captain Lee Covey ("Capt. Covey"), the investigator for the Internal Affairs Unit. She told Capt. Covey that, although she was not 100% sure, she believed that the damage probably occurred while she was in Jackson the previous day attending a conference, and that she did not know who hit the car. She did not tell Capt. Covey that she suspected that Baker may have caused the damage to the vehicle. Capt. Covey told Hill to file a property accident report with the Jackson Police Department, because that is where she told him the accident occurred, and to file an incident and insurable loss report with the City of Germantown.

Later that morning, Hill did as instructed and telephoned the Jackson Police Department; she reported the accident to Officer James Price ("Price"). Based on the information Hill gave

him, Price completed a Private Property Accident Report, stating that Hill "was attending a conference at the Double Tree" hotel the day before the accident and that, between 1:30 and 5:00 p.m., "someone hit her police unit and left the scene." The report stated that the vehicle was damaged in the area of the rear bumper, and that the dollar amount of damage was unknown.[1] Price's report also noted that "[t]here is no suspect, driver or vehicle in this case." Hill also submitted to Captain Covey a City of Germantown Supervisor's Incident and Insurable Loss Report, indicating that her take-home vehicle was damaged by an unknown driver in Jackson on the previous day.

During the afternoon on that same day, Hill and Baker had further discussions about the damage to Hill's take-home vehicle. The substance of these discussions is also disputed. Hill again questioned Baker about whether she caused the damage to Hill's take-home vehicle, and Baker admitted that she may have done so. Hill asked Baker whether the back-up sensors in Baker's SUV had sounded, and whether the other back-up safety features had been triggered, and Baker said no. When Baker's children got out of school, Hill asked them if they remembered whether Baker had backed into her vehicle that morning before school, and the children did not respond. Hill then asked whether they had heard the back-up sensors on the vehicle, and they said that they did not.

In mid-March 2007, the relationship between Hill and Baker ended in an acrimonious and tumultuous manner. At the time, Hill was out of town on personal leave. Baker telephoned Hill and warned her that if she did not return home immediately she would regret it. When Hill arrived back at Baker's Collierville home, she proceeded to move out of the residence. While Hill was moving her belongings, Baker threatened "to get her job," indicating that she had some "ammunition" against Hill. Specifically, Baker threatened to tell Capt. Covey that she had damaged Hill's take-home vehicle in January, and that Hill had intentionally reported that the accident happened otherwise.

On March 13, 2007, Hill called a friend on the Germantown police force, Captain Jodi Whitfield ("Capt. Whitfield"), who was on vacation with his family at the time. Hill told Captain Whitfield that she had broken off her relationship with Baker and she was leaving Baker's home. Hill also told Capt. Whitfield that Baker was "the one that hit the car," and asked him what she should do about the situation. Capt. Whitfield advised Hill to call the Jackson Police Department, retract the initial erroneous report, and call the Collierville Police Department to make a private property crash report. Although Hill indicated to Captain Whitfield that she would take the steps he suggested by Capt. Whitfield, she took no corrective action at that time.

---

[1]Repair estimates in the record are between $800 and $900.

The next day, March 14, 2007, Baker called Capt. Covey, told him that Hill's take-home police vehicle was still in her driveway, and demanded that it be removed. That same day, Hill called Capt. Covey twice. She told him that she and Baker were "having problems" and cautioned that Baker might make false accusations against her, alleging abuse of Baker's children, drug use, or "anything else." In the next call, Hill told Capt. Covey that her take-home police vehicle was missing, and told him that there was a Germantown Police Department shotgun inside the car.

Several days later, on March 19, 2007, Capt. Covey contacted Capt. Whitfield to obtain the serial number assigned to Hill's shotgun so that it could be listed as stolen on the State computer. In the conversation, Capt. Whitfield speculated that Baker may have had Hill's vehicle towed. Capt. Whitfield mentioned to Capt. Covey that, the previous week, Hill had told him that Baker had damaged Hill's take-home vehicle. After several more questions, Capt. Covey learned that Hill had told Capt. Whitfield that Baker caused the damage to the vehicle that Hill reported in January.[2] After learning this, Capt. Covey opened an Internal Affairs investigation related to the damage to Hill's take-home police vehicle.

### *Internal Affairs Investigation*

On March 29 and 30, 2007, Capt. Covey took statements from Baker, Hill, and Capt. Whitfield about the damage to Hill's take-home vehicle that was discovered on January 19, 2007.

When Capt. Covey asked Baker about the incident, Baker readily admitted that she scraped Hill's take-home vehicle that morning before taking her children to school.[3] Baker told Capt. Covey that she "did not see the car. The car didn't register in my mirrors. The back up signal on my car didn't beep. . . . I scraped it with the back rear, I guess you call that the fender. It basically scraped the dirt since the car was dirty. There wasn't a whole lot of anything." She said that her car was only "scuffed. . . . And [Hill] said that it could be buffed out. . . . But there's no dent or anything." Baker said that she told Hill that day that she had struck Hill's police vehicle. She recounted that Hill called her on her cell phone and said, " 'You hit my car,' and I said, 'I know. I was going to tell you when I got back.' " Baker explained:

---

[2] In the conversation, Capt. Covey initially thought that Capt. Whitfield meant that Baker damaged the vehicle in trying to move it herself from the residence. He later realized that Capt. Whitfield was referring to the damage to the vehicle that Hill had reported in January.

[3] Capt. Covey interviewed Baker once on the telephone and another time in person.

I told Stephanie. She asked me about it. I said, "Yes." I was backing out. She got very irate and said that I had cost her her take-home car. Then that she was going to have to file a false police report, and that I should not ever tell anyone she was going to do this. I told her, "Then don't do it. Just tell them I did it." "Well, if I do that, I'll lose my take-home car." That's the last I know anything about it. I don't know if she ever filed the report.

Capt. Covey asked Baker, "So there wasn't a delay in letting [Hill] know that you had accidentally hit her vehicle?" Baker responded, "No."

Although Baker initially indicated that she had scraped dirt off Hill's take-home vehicle, she later stated that she had scraped frost off of Hill's vehicle, and that "that's how [Hill] noticed it when she left for work right after me . . . ." Baker was shown photos of both her SUV and Hill's take-home vehicle, and she circled the damage that she believed was caused by the accident. Baker admitted that, in the past, she accidentally backed into a white truck personally owned by Hill.

In her interview with Capt. Covey, Baker denied calling Hill and threatening her the day before she called Capt. Covey to demand that Hill's take-home police vehicle be removed from her driveway. When asked whether she had had any discussions with Hill about the accident at any time after the day it occurred, Baker responded that the only discussion had taken place on the weekend after the accident, when Hill and her neighbors, Brian and Kristin Noble, "ragged" and teased Baker about her inability to back up a vehicle without hitting something.

In his statement, Capt. Whitfield told Capt. Covey about his conversation with Hill on March 13, 2007. He said that, during their conversation, Hill told him that "[Baker] is the one that hit the car." He said that he advised Hill to take corrective action, given the fact that Baker actually caused the damage to the take-home vehicle and the reports filed by Hill stated otherwise. Capt. Whitfield said that Hill "indicated that's what she was going to do." Capt. Whitfield did not follow up and had not spoken to Hill about the accident since that day.

In the course of Capt. Covey's investigation, Hill gave three statements to him, all in the presence of Inspector Rodney A. Bright ("Insp. Bright").[4] As detailed below, Hill's answers were conflicting and some needed clarification, so several questions were asked repeatedly.

Initially, Hill claimed that, when she went to her car the morning of January 19, she noticed scratches, but did not think that the scratches were new because the frost on the car was not

---

[4]Inspector Bright was the commander over the Investigative Division. By Germantown Police Department policy, he is allowed to be present if one of his subordinates is the focus of an internal investigation.

disturbed. Hill took photographs of the damage and reported it when she arrived at work that morning. Hill explained that, at the time, she thought the car had been damaged while she was in Jackson because, although she noticed scratches on her take-home vehicle the morning of January 19th, she did not think they had been "freshly done." Hill was upset, did not know what to do, and did not "want to lose [her] take-home car." She noted that, when she filed the accident report in Jackson, she told Officer Price that she was not positive that the car was hit in Jackson but did not "know where else it could have happened."

Capt. Covey asked Hill about Baker's involvement in the damage to the take-home vehicle. In her first response, Hill indicated that Baker "never mentioned" anything about her involvement until March:

> [Capt. Covey]: So on the 19th of January, did Jamie Baker advise you that she accidentally struck [your take-home vehicle]?
> [Hill]: No. She did not.
> [Capt. Covey]: Okay. At any time, did you notify anyone else that you believe that she struck the vehicle?
> [Hill]: I did. While I was out on vacation or went on leave in March, the week of March 12 that time when I was gone, Ms. Baker and I are involved in a separation. . . . She told me that she was going to notify the Police Department that she had hit my car. I said, "Whoa, whoa. You need to back up because you haven't told me anything about this, and I filed my police report with Jackson, TN." I even told her that day I did. She never mentioned it. Nothing. I said, "If you're now telling me you hit my car, why are you just telling me now?" She said, "Well, I didn't want you to be upset with me." . . . Of course, I was real upset cause I didn't know what happened to my car when I filed the report. I didn't know whether to file it in Collierville or whether to file it in Jackson. I knew that I'd been here and home and Jackson, so I filed it in Jackson. I looked at her car, and I talked to her after I got home. I looked at it, and I didn't see any damage.
>
> [Capt. Covey]: When was this?
> [Hill]: This was when I came home that week [in March 2007]. . . .

As the questioning went on, Hill acknowledged that, on January 19, the day of the accident, she and Baker had several discussions about whether Baker had hit Hill's vehicle, both before and after Hill filed the accident and insurance reports. Hill was suspicious that Baker had caused the damage, because Baker had hit one of Hill's vehicles on a previous occasion, so she asked Baker "flat out" whether she had hit Hill's vehicle. Baker did not readily admit her involvement, Hill said, because she "didn't want [Hill] to be upset with [her]." Baker responded to Hill's inquiry by saying that she was not sure, but she conceded that she might

have hit Hill's vehicle. However, Hill said that Baker also told her that the back-up sensor and the other safety features in her car did not engage.[5] Hill claimed that Baker also inspected her own car to see whether she had sustained any damage, and determined that she had not.

Still suspicious, later that day, Hill asked Baker's children whether their mother had hit Hill's vehicle that morning. At one point, Hill told Capt. Covey that the children replied, "No." At another point, Hill said that, in response to her inquiry, the children "just kind of looked at each other" and said, "Well, she got really close, you know." Hill said that she then asked the children whether they had heard the back-up sensors sound, and the children said that they had not. Given these circumstances, Hill said, she concluded that Baker did not actually hit her vehicle. Hill admitted that she did not personally look at Baker's vehicle to see whether it had sustained any damage until after the threatening telephone call from Baker in March.

Capt. Covey questioned Hill further to try to ascertain when she became aware of the possibility that Baker might have caused the damage to the take-home vehicle. He asked Hill to clarify when her discussions with Baker took place:

> [Capt. Covey]: Okay. So on January 19th on that morning, did you call her after she'd left with the kids that morning?
> [Hill]: I did. I called her and I asked her flat out because I came out and there was –
> [Capt. Covey]: On January 19th?
> [Hill]: I don't know exactly.
> [Capt. Covey]: We're talking about 3 months ago. Was it January 19th or was it March 12th?
> [Hill]: No. March 12th is – the week of March 12th. I can't tell you if it's March 12th that day. That week.
> [Capt. Covey]: So the week of January 19th or the week of March 12th?
> [Hill]: We're talking about March.
> [Capt. Covey]: Okay. On January 19th around 8 a.m., or so, did you call Ms. Baker on her cell phone after she had left the house?
> [Hill]: I call her every morning.
> [Capt. Covey]: Okay. On that morning, did you talk to her about any damage to [the take-home vehicle]?
> [Hill]: I did.
> [Capt. Covey]: On January 19th?

---

[5]Hill said that she installed safety features in Baker's car to alert her to when she is near another object because, according to Hill, "she does back into stuff."

[Hill]: I did. If that's the date, I called. I see you have the Nextel phone. If that's the date.

[Capt. Covey]: What did you specifically say to her about the damage? We're talking about January 19th.

[Hill]: Okay. I asked her flat out, "Did you hit my car? Somebody's hit my car." . . . She didn't say a word to me. I was just kind of freaked out. I didn't know what to do with my car. I came in. I talked to you.

[Capt. Covey]: So she did not respond at all when you asked her that question?

[Hill]: She did not. Actually, I didn't ask her if she hit my car. I said, "Somebody's hit my car."

[Capt. Covey]: But did you ever ask her on January 19th if she hit your car?

[Hill]: No. I just made the statement, "Somebody's hit my car." . . . She never came forward and said, "Well, I hit your car."

Hill then repeated that Baker "never said that [she hit the vehicle] to me until that week of the [March] 12th whatever."

Hill related to Capt. Covey that Baker called her in March in the midst of their break up to threaten that she was going to "cost [Hill] her job," and that Baker was going to "call the police department and tell them some stuff." Hill said that Baker told her that she planned to tell the Germantown Police Department that she had caused the damage to Hill's vehicle that occurred in January. Hill indicated that this was the first time Baker had admitted to Hill that she hit Hill's take-home vehicle. Hill said that she responded by telling Baker that "if you did [hit the vehicle], you need to tell me now because I need to know because I've got to rectify that." According to Hill, Baker was aware that reporting this information would be distressing for Hill.

Hill also recounted to Captain Covey her March 13, 2007 conversation with Capt. Whitfield. Hill indicated that she told Capt. Whitfield in that conversation that she was unsure about whether Baker actually hit her vehicle:

I said, "She's telling me she thinks she's hit my car." He said, "Well, do you think that she has?" I said, "Well, I haven't seen any damage on the Expedition [Baker's vehicle]. I think she's trying to cause me problems at work." I said, "You know, I don't know why she would even say that she hit my car," but I said, "I'm going to have to check it out."

Hill recalled that Capt. Whitfield told her at that time that she would need to correct her filed reports only if she looked at Baker's vehicle and found damage.

Initially, Hill told Capt. Covey that she followed Capt. Whitfield's instructions by calling the Jackson Police Department to correct her accident report; she said that she left a message for someone in that office to call her back. Hill told Capt. Covey that she had not yet called the Collierville Police Department to file a private property crash report. In response to further questions, Hill could not recall the date on which she left the message at the Jackson Police Department, and indicated that in fact she may have called the Collierville Police Department. After still more questioning about the timing and details of her call to the Jackson Police Department, Hill said: "I'm almost positive I talked to Jackson. Maybe I didn't. Maybe I just had that in my notes to do . . . ." She then explained that regardless, correcting her previously filed report with the Jackson Police Department and filing a report with the Collierville Police Department was not necessary because, when she looked at Baker's SUV, she saw no damage. Later in her statement, Hill allowed that she "should have" followed Capt. Whitfield's advice:

> [Capt. Whitfield] told me what to do. I did not follow through with his advice, and I should have. After I looked at [Baker's] Expedition, I knew she didn't do it, so therefore; I didn't want any more grief on me. I was being selfish. I didn't want any more grief on me.

At all times, in all three statements, Hill maintained that she did not believe that Baker actually hit the take-home vehicle, but rather that Baker was trying to cause problems for Hill by saying that she did.

On March 30, 2007, following up on Baker's statement on the day prior, Capt. Covey interviewed Baker's neighbors, Brian and Kristin Noble. At that time, the Nobles remembered talking with Hill and Baker two to three months earlier about Baker hitting Hill's take-home vehicle. Kristin Noble told Capt. Covey that Baker "later on admitted that she backed into the car, and I guess she didn't tell [Hill] right away or something. I don't know when or what period of time lapsed from when it happened to when she actually told Stephanie."

Also on March 30, 2007, Capt. Covey inspected Hill's take-home police vehicle and Baker's SUV and photographed both vehicles. Capt. Covey concluded that, contrary to Hill's statements, there was obvious damage to Baker's vehicle and that the damage to Baker's vehicle was consistent with Baker's statement about how the accident occurred. Ultimately, Capt. Covey concluded from his overall investigation that Hill had made statements during the Internal Affairs Investigation that were both inconsistent and untruthful.

On April 4, 2007, as per instructions from her attorney and Capt. Covey, Baker filed an accident report with the Collierville Police Department. In the report, Baker admitted that her SUV struck Hill's take-home vehicle on January 19, 2007.

*Statement of Charges*

On April 10, 2007, Capt. Covey and Insp. Bright met with Hill and presented her with a statement of charges. Hill was charged with a violation of DR 108 (Truthfulness)[6] and DR 120 (Neglect of Duty).[7] The Truthfulness charge related to Hill's statements in the Internal Affairs Investigation, in which she allegedly furnished information that she knew to be incorrect, false, or deceitful, including information that was inconsistent with the physical evidence. The Neglect of Duty charge stemmed from the fact that Hill allegedly gave information to Capt. Covey and made reports to the Jackson Police Department and the City of Germantown with respect to the damage to her take-home vehicle without disclosing her suspicion that Baker may have caused the damage, and the fact that Hill failed to correct the police reports after March 13, 2007, when it is undisputed that Baker told Hill that she had hit the take-home vehicle.

On April 10, 2007, Capt. Covey and Insp. Bright met with Hill to review Capt. Covey's findings of fact and the charges with her. Capt. Covey drew up a Statement of Particulars, in which he summarized his findings and the basis for the charges against Hill. In the Statement of Particulars, Capt. Covey said that he found that Hill filed the accident and insurance reports with the police departments in Jackson and Germantown without informing anyone in the offices "that Jamie Baker might have caused the damage to [Hill's] vehicle."

---

[6]DR 108 provides that "[a] member shall not give any information, either oral or written, in connection with any assignment or investigation that is either knowingly incorrect, false, or deceitful."

[7]DR 120 provides in relevant part:
> A. Each member, because of his/her rank assignment, is required to perform certain duties and assume certain responsibilities. Failure to properly function in these areas constitutes neglect of duty. This regulation prohibits any omission or failure to act by any member of the Department, whether on or off duty, when such action is required by the stated policy, goals, rules, regulations, orders, and directives of this Department. It applies to any member who, through carelessness, inefficiency, or design, fails to implement the policy goals, rules, regulations, orders, training, and directives of the Department.
> . . .
> D. Employees shall perform their duties in a manner, which will maintain the highest standard of efficiency in carrying out the functions and objectives of the department. Unsatisfactory performance may be demonstrated by a lack of knowledge of the application of laws to be enforced; unwillingness or inability to cooperate with fellow employees and to perform assigned tasks; the failure to conform to work standards established for an employee's rank, grade or position; the failure to take appropriate action on the occasion of a crime, disorder or other condition deserving police attention; neglect of duty; the display of cowardice, absence without leave or excessive tardiness, or the physical or mental inability to perform required duties.

Given the statements from Baker and the Nobles, and also Capt. Covey's own observation of the damage to both vehicles, Capt. Covey concluded that Hill had given false or misleading testimony in the internal investigation.

In the course of the review meeting, Hill attempted to clarify her earlier statements. She acknowledged that there was in fact damage to the left rear corner of Baker's SUV, but explained that the damage had been caused a few years earlier when Baker backed into an aluminum fence at a local home show. Hill insisted that, when she had previously told Capt. Covey that there was *no* damage to Baker's SUV, she actually meant that there was no *new* damage to the SUV. After this review meeting, Capt. Covey found that Hill, in making these further statements, had given still more "answers that were knowingly incorrect, false and deceitful." He agreed that Baker had emotional reasons not to give truthful statements but found that Baker's assertions could "be corroborated through additional means of witnesses and evidence . . . ."

### *Administrative Proceedings*

A disciplinary hearing on the charges against Hill was conducted before the Germantown Police Department Hearing Board ("Hearing Board") on July 12, 2007. At the hearing, Hill was represented by counsel and was permitted to call and cross-examine witnesses. At the outset of the hearing, Capt. Covey testified about his involvement in the matter, about the findings of fact on which the charges were based, and about other aspects of his Internal Affairs Investigation. The photographs of Baker's SUV and Hill's take-home police vehicle were submitted, as well as other pertinent documents.

Regarding the Neglect of Duty charge, Capt. Covey testified that, under the Germantown Police Department's policies, if Hill thought on January 19, 2007, that there was a possibility that her take-home police vehicle had been damaged by someone other than an unknown driver, she had a duty to report that suspicion to her superiors in the Department. He said that Hill's own statement showed that she either knew, or was aware of the strong possibility, that Baker hit her vehicle, and that she had a duty to report this. Capt. Covey testified that Hill's undisputed failure to file corrected reports with the Jackson and Germantown police departments was the basis for the neglect of duty charge against her. He stated, "If you had a belief that there is a possibility that there are two ways something could have happened you would have a duty to report that."

Capt. Covey testified that it was his personal belief that Hill did not intend to file false police reports regarding the accident at the time the reports were filed. However, he believed that, from the beginning, Hill knew that it was Baker who damaged her take-home vehicle. Capt. Covey acknowledged that the motivation behind Baker's testimony might have been based on the "nasty domestic breakup." However, Capt. Covey believed that Baker's testimony

-11-

that she hit Hill's vehicle was truthful. His belief in this regard was based in part on the fact that Hill's testimony was conflicting, inconsistent, and misleading, while Baker's testimony was straightforward. In addition, Baker's testimony was consistent with the physical evidence and the testimony of the Nobles. Capt. Covey noted as well that, in the course of her police duties, Hill had given him misleading statements in the past. During the Internal Affairs Investigation into the damage to Hill's take-home vehicle, Capt. Covey observed, Hill made statements to him that were "inconsistent and untruthful." He explained that "[t]here are things that she said that didn't happen that I believe did happen. These statements she made to me that were inconsistent and misleading." Hill's statements, he asserted, constituted a violation of the Truthfulness provision of the Germantown Police Department rules.

Baker testified at the Board hearing as well. She reiterated that she hit Hill's take-home police vehicle in January 2007, and that she informed Hill of this fact on the day that the accident happened. The weekend after the accident, Baker said, Hill and Brian Noble were joking about this incident and about the poor driving skills of both Baker and Kristin Noble. Baker insisted that the police report she filed in April 2007, claiming responsibility for the damage, was true and accurate. Baker admitted that she had accidentally backed her SUV into a gate at a local home show, but claimed that she did not recall whether this prior collision scratched her SUV at all.

Baker testified that she and Hill were "friends" and denied that they were involved in a "domestic partnership" or that they slept in the same bedroom. She claimed that Hill had paid her rent to live in her home, in the form of making the payments on Baker's SUV. Baker denied making threats to Hill about her job.

Kristin and Brian Noble also testified at the Board hearing. Kristin Noble said that she remembered seeing the damage to Hill's vehicle, but that she believed that the damage was on the side back panel. Kristin Noble testified that Hill said to her: "Jamie hit [my] car again." Although neither Kristin nor Brian Noble could remember particulars about their conversation with Hill and Baker, they reaffirmed the statements they had given to Capt. Covey.

Hill testified on her own behalf. In recounting the events of January 19, 2007, Hill said that, when she came out of her house that morning, she noticed "a few scratches" on the back of her car, under the frost. She rubbed the scratches with her hand, then retrieved a towel from the house and rubbed off the frost with the towel and looked at the scratches.[8] When Baker called Hill that morning, Hill commented that she had damage to her vehicle. Hill could not

---

[8]This information was not included in Hill's prior statements to Capt. Covey.

remember what Baker's immediate response was, or whether she immediately asked Baker "flat out" whether she had hit Hill's vehicle. After Hill filed the reports with the Jackson and Germantown Police Departments, she asked Baker whether she had hit Hill's vehicle, and Baker said she did not think she had hit it. Hill said that she asked Baker several questions, and that Baker told her that her car's back-up sensors did not sound, she did not feel a bump, she did not see Hill's vehicle move, and Baker's children, sitting in her vehicle, did not comment. Hill said that, in response to Hill's inquiry, the children told her that Baker did not hit Hill's car. In light of all this, Hill was satisfied that Baker did not hit her take-home vehicle. Hill noted that, when she filed the reports with the Jackson and Germantown police departments stating that the damage was caused the day before in Jackson, she said that she was not one hundred percent sure that the damage happened in Jackson.

According to Hill, Baker told her for the first time in March that she had caused the damage to Hill's take-home vehicle in January. Even after talking to Capt. Whitfield, Hill asserted, she did not file corrected reports in either Jackson or Germantown because she did not believe that Baker had caused the damage to her vehicle, and she could not prove that Baker caused the damage. Hill explained that she "chose to talk to Captain Whitfield other than Captain Covey" because she trusted Captain Whitfield, but did not trust Captain Covey. Hill reaffirmed that, based on all of the circumstances, she still did not believe that Baker actually caused the damage to her vehicle in January 2007.

Hill's co-worker, Lieutenant Angie Lewis ("Lt. Lewis"), testified at the Board hearing that she was present at the Germantown Police Department on January 19, 2007 when Hill called the Jackson Police Office to report the damage to her car. Lt. Lewis helped Hill move out of Baker's house, and she testified that Baker was belligerent and threatening to Hill while Hill was moving out. Lt. Lewis testified in particular that Baker threatened that she was "going to have [Hill's] job."

The parties entered into a stipulation to obviate the need for Capt. Whitfield to testify. They agreed that, had he testified, his testimony would have been substantially similar to the statement that he gave to Capt. Covey in the course of the Internal Affairs Investigation.

After hearing the testimony and reviewing the evidence, the Hearing Board sustained the charges against Hill of Neglect of Duty and Truthfulness. Based on this, the Board recommended Hill's dismissal. Germantown Police Chief Richard Hall accepted the recommendation of the Board and terminated Hill's employment. As per Germantown policies, Hill appealed Chief Hall's decision to the Germantown City Administrator.

On July 24, 2007, the City Administrator heard Hill's appeal. The Administrator had previously asked that an accident reconstructionist be sent to inspect the damage to Baker's vehicle and compare it to the damage on Hill's take-home police vehicle. Capt. Covey did

-13-

so, and he accompanied the accident reconstructionist to the site and took photographs of both vehicles and measurements of the damage. The accident reconstructionist observed that the damage to both vehicles lined up, and concluded that it was "highly possible that the collision occurred just as Ms. Baker stated it did." The report of the accident reconstructionist was provided to the City Administrator. Based on the report from the accident reconstructionist "and the detailed volume of testimony and throughout the investigation," which by then totaled 441 pages, the City Administrator sustained the charges against Hill and affirmed the decision of the Chief of Police to terminate her employment.

### *Trial Court Proceedings*

On September 20, 2007, Hill filed the instant petition for writ of certiorari in the trial court, seeking to have the termination of her employment overturned. She claimed that the acts of the Respondents — the City of Germantown, the Germantown Police Department, the Board of Mayor and Alderman of the City of Germantown (collectively, "the City") — were arbitrary and capricious, and that the process used violated her state and federal due process rights. Hill also claimed that her dismissal was not based on material, competent, relevant, or reliable evidence. She asserted that the job actions taken against her were retaliatory, arguing that they were for infractions so minor that they must have been "motivated by the fact that she previously had filed an EEOC complaint against the Germantown Police Department which was sustained." In addition, Hill stated that the job actions taken against her were more severe than the job actions that had been taken with respect to similarly situated male officers, and that, therefore, the City violated her constitutional right to equal protection.

The City filed an answer denying the allegations in Hill's petition, pointing out that Hill was an employee-at-will and that she had no constitutionally protected property interest in continued employment with the City of Germantown. The City further asserted that the decision of the City Administrator was supported by substantial material evidence and was not arbitrary, capricious, or illegal. The City filed a complete transcript of the administrative proceedings before the Hearing Board and the City Administrator for the trial court's review.

On December 9, 2008, the trial court conducted a hearing.[9] On February 4, 2009, the trial court issued lengthy findings of fact and conclusions of law, granting the relief requested in Hill's petition.

In its findings, the trial court recounted substantial parts of the testimony, with particular emphasis on Hill's testimony about her uncertainty regarding whether Baker had caused the

---

[9]The appellate record does not include a transcript of that hearing.

damage to her take-home police vehicle, as well as Baker's threats against Hill and her implausible assertions that she and Hill had not been romantic partners and that she did not threaten Hill. The trial court then set forth the high standard for judicial review of an administrative decision such as the City's decision to terminate the employment of a police officer, finding that the court's review was limited to determining whether the City (1) exceeded its jurisdiction, or (2) acted illegally, arbitrarily, or fraudulently.

The trial court then evaluated the evidence as it related to the specific charges against Hill:

> 9. The gravaman of the truthfulness and neglect of duty charges is whether or not the Petitioner knew, at the time that she made the report to the Jackson Police Department, that the damage to her take-home police vehicle (#329) had been caused by Baker.
>
> 10. The evidence in the record is that Petitioner was never certain whether or not Baker had actually hit vehicle #329. She had told this to Captains Covey and Berke as well as to the Jackson Police Department when she made the report. The only way that Petitioner could have violated the Neglect of Duty or Truthfulness policies of the Germantown Police Department would be if the evidence proved that Baker had told Petitioner on or about January 19, 2007 that she struck the vehicle and that in spite of knowing the truth Petitioner filed a false report. This required the City to credit Banker's testimony rather than Petitioner.
>
> 11. The Court finds from a careful review of this record that Baker's testimony is so lacking in credibility that it could not have been relied upon by a reasonable person reviewing this record to support the charges against Petitioner. Not only did Baker have a motive and apparent desire to not be truthful in order to retaliate against Petitioner because of the breakup of their romantic relationship, it is clear to this Court that she was not truthful in either her statement or sworn testimony. Baker, in her cross examination, denied that she and Petitioner had been in a romantic relationship at the time of this incident event though Captain Covey, Captain Whitfield, Captain Berkes, Lt. Lewis and presumably the entire Germantown Police Department were aware of it. The testimony of Baker's neighbors, Brian and Kristen Nobles, contradicted Baker's testimony on both the conversations that allegedly took place between them as well as the nature of the relationship between Baker and Petitioner. Finally, Baker denied ever threatening Petitioner's job, testimony that is directly contradicted by Lt. Lewis. Without Baker's testimony being credible, the case against Petitioner fails.

(Footnote omitted). The trial court was dismissive of the findings of the accident reconstructionist, noting that he had opined only that Baker's version of events was "highly possible," rather than giving an opinion that it was "probable." The trial court thus found that, to uphold the termination, the evidence would have to show that Hill *knew* when she made the damage reports that the damage was caused by Baker. Such a finding, it determined, could be based only on crediting Baker's testimony, and Baker's testimony was so lacking in credibility that the City could not reasonably rely on it. On this basis, the trial court ordered that Hill be reinstated to her former position, together with back pay and benefits. From this order, the City now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, the City argues that the trial court erred in determining that there was not material evidence to support the administrative decision to terminate Hill, and in finding that the City's decision was arbitrary and capricious. In addition, the City argues that the trial court reweighed the evidence, inquired into the intrinsic correctness of the lower tribunal's decision, made credibility determinations, and substituted its judgment for that of the lower tribunal, all of which is not permitted under the applicable standard. For these reasons, the City argues, the trial court's decision must be reversed.

On appeal, this Court utilizes the same standard of review used by the trial court in reviewing the decision of an administrative tribunal under a common law writ of certiorari.[10] *Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980) ("The scope of review by the appellate courts is no broader or more comprehensive than that of the trial court with respect to evidence presented before the Board."). The parties agree that the standard of review applicable to a common law petition for writ of certiorari is limited to determining whether the municipal authority (1) exceeded its jurisdiction or (2) acted illegally, arbitrarily, or fraudulently. *Citizens for Collierville, Inc. v. Town of Collierville*, 977 S.W.2d 321, 323 (Tenn. Ct. App. 1998). The reviewing court may not (1) reweigh the evidence, (2) inquire into the intrinsic correctness of the lower tribunal's decision, or (3) substitute its own judgment for that of the lower tribunal. *421 Corp. v. Metro. Gov't of Nashville*, 36 S.W.3d 469, 474 (Tenn. Ct. App. 2000). Rather, the court must review the

---

[10]We review this case under the common law writ of certiorari standard, as opposed to the standard set out in the Uniform Administrative Procedures Act ("UAPA"), because it is undisputed that Hill was an employee at will and she was not alleged to be a "civil service employee" within the meaning of Tennessee Code Annotated § 27-9-114(b)(1). Furthermore, there has been no argument that the administrative decision on appeal was rendered by a "civil service board" within the meaning of the UAPA. *See Davis v. Shelby County Sheriff's Dept.*, 278 S.W.3d 256, 262 (Tenn. 2009); *Tidwell v. City of Memphis*, 193 S.W.3d 555, 559-60 (Tenn. 2006). Nevertheless, we note that, our decision herein would be the same under either standard. *See* Tenn. Code Ann. § 4-5-322 (2005).

record to determine whether there is any material evidence to support the action of the of the administrative tribunal or government official. ***Watts***, 606 S.W.2d at 276-77. "Substantial and material evidence is 'such relevant evidence as a reasonable mind might accept to support a rational conclusion' and to furnish a reasonably sound basis for decision under consideration." ***City of Memphis v. Civil Serv. Comm'n***, 238 S.W.3d 238, 243 (Tenn. Ct. App. 2007). The administrative decision is "presumed to be valid and a heavy burden of proof rests upon the shoulders of the party who challenges the action." ***Citizens for Collierville***, 977 S.W.2d at 324. If any possible reason exists to justify the administrative decision, it must be upheld; conversely, if there is no evidence to support the decision, it must be held to be arbitrary. ***McCallen v. City of Memphis***, 786 S.W.2d 633, 641 (Tenn. 1990).

## ANALYSIS

The City argues that the trial court made a basic error by perceiving that, to uphold the termination of Hill's employment, the record had to contain material evidence establishing that, at the time Hill reported the damage to her vehicle, she *knew* and failed to disclose that the damage was caused by Baker. Based on this erroneous premise, the City argues, the trial court overturned the City's determination as to the credibility of the witnesses and substituted its order judgment for that of the administrative tribunal. As such, the City argues, the trial court's decision was erroneous.

In reviewing the record, it is clear that the Germantown Police Department and the City consistently interpreted its own rules to require a police officer to disclose not only her knowledge of how her vehicle was damaged, but also all of the information she had as to how it *may* have been damaged. It is also clear that Hill was aware that the Germantown Police Department expected as much from her as part of her duties. Generally, a court reviewing an administrative decision gives "great deference and controlling weight" to the lower tribunal's interpretation of its own rules. ***Jackson Express, Inc. v. Tennessee Public Serv. Comm'n***, 676 S.W.2d 942, 945 (Tenn. 1984). Therefore, we must agree with the City that the trial court erred in holding that "[t]he gravaman of the truthfulness and neglect of duty charges is whether or not [Hill] knew, at the time she made the report to the Jackson Police Department, that the damage to her take-home vehicle . . . had been caused by Baker." This holding was an erroneous foundation for the remainder of the trial court's analysis of the evidence. Consequently, we must evaluate the evidence on the Neglect of Duty and Truthfulness charges based on the premise that Hill's duty as a police officer for the Germantown Police Department required her to be forthcoming and to timely disclose all of the information she had about the possible cause of the damage to her take-home police vehicle.

On this basis, then, we first consider the evidence related to the Neglect of Duty charge. As noted above, the Neglect of Duty charge applies to Hill's act of filing accident and insurance reports on her take-home police vehicle in Jackson and Germantown, respectively, without disclosing that the damage may have been caused by Baker, and also her failure to correct these reports once Baker directly admitted that she caused the damage to Hill's vehicle.

Apart from the trial court's interpretation of the duties required of an officer with the Germantown Police Department, the trial court's decision was also based in large part on its conclusion that Baker's testimony was "so lacking in credibility that it could not have been relied upon by a reasonable person reviewing this record to support the charges against [Hill]." In other words, the trial court determined that reliance on Baker's testimony, given her lack of credibility, did not provide a "reasonably sound basis for the decision under consideration." *See City of Memphis v. Civil Serv. Comm'n*, 238 S.W.3d at 243.

Where the lower tribunal has conducted a hearing and has evaluated the credibility of the witnesses as they testify, a reviewing court must give great weight to the tribunal's credibility determination. *See City of Memphis v. Civil Serv. Comm'n*, 239 S.W.3d 202, 208 (Tenn. Ct. App. 2007); *City of Memphis v. Civil Serv. Comm'n*, 238 S.W.3d at 243; *Pruitt v. City of Memphis*, No. W2004-01771-COA-R3-CV, 2005 WL 2043542, at *7 (Tenn. Ct. App. Aug. 24, 2005). Therefore, both this Court and the trial court are required to accord great deference to the Hearing Board's evaluation of the credibility of Baker, Hill, and all of the witnesses who appeared at the administrative hearing.

Certainly, there is ample justification for the trial court's skepticism about Baker's credibility. Undoubtedly, Baker testified untruthfully that she was not in a romantic relationship with Hill, and that she did not threaten Hill during their volatile break up. Baker's behavior made it clear that she had an "ax to grind" as to Hill and was vindictive.

City officials investigating the damages to Hill's vehicle were aware from the outset of Baker's motivation to cause trouble for Hill. Capt. Covey, who knew the parties involved, took their statements, and assessed their demeanor during the Internal Affairs Investigation, acknowledged that Baker was prejudiced against Hill and that she had emotional reasons to give false testimony against Hill. For this reason, he looked for corroborating evidence, which consisted of the physical evidence, the statements of the Nobles, the statement of Capt. Whitfield, and the opinion of the accident reconstructionist. For example, the statements by the Nobles, while less than precise, make it clear that Hill knew, long before she disclosed to City officials, that Baker likely caused the damage to her vehicle. Moreover, Capt. Covey explained to the Hearing Board that he found Baker's testimony to be straightforward, while he found Hill's testimony to be conflicting and misleading. The Hearing Board apparently agreed. Unless Baker's testimony is clearly contrary to undisputed facts in the record, we

-18-

are obliged to give appropriate deference to the Hearing Board's evaluation of her credibility. *See City of Memphis v. Civil Serv. Comm'n*, 238 S.W.3d at 243.

Most importantly, Hill's own statements support the Neglect of Duty charge. Hill admitted that she said to the Nobles: "Yeah, [Baker] probably hit my car, and she don't want me to know it." After extensive questioning, Hill admitted that Baker told her that morning that she might have hit Hill's vehicle. Rather than disclosing this information to Germantown Police officials, Hill chose to rely on Baker's statement that the back-up sensors in her SUV did not sound. Given all of the statements made by Hill, Baker, Capt. Whitfield, and the Nobles, as well as the physical evidence on the damage to both vehicles, we find that material evidence supports the finding that Hill was aware of the possibility that Baker had caused the damage to her car at the time she filed the damage reports with the Jackson and Germantown Police Departments, but she failed to include this information in the reports. Furthermore, even after Baker told her that she definitely caused the damage to the vehicle, Hill still failed to change her reports to include this information or to file a report with the Collierville Police Department. Capt. Covey testified that Hill had a duty to file complete reports and/or to correct her reports, and that her failure to do so constituted a breach of that duty. Therefore, under all of the circumstances, we find that there was material evidence to support the City's finding against Hill on the Neglect of Duty charge.

As noted above, the Truthfulness charge against Hill was based solely on the statements Hill gave during the course of the Internal Affairs investigation into the damage to her take-home vehicle. Specifically, the charge was based on the statements given by Hill, deemed to be conflicting and inconsistent. From our review of the record, there is ample basis for this conclusion. Initially, Hill said that she did not ask Baker on January 19, 2007 whether she hit her vehicle. She later stated that she and Baker "got into it" more than once that day and that Hill repeatedly asked Baker whether she had hit her car. Hill also stated that she did not ask Baker that morning whether she hit Hill's vehicle, but merely commented to Baker that her police vehicle had been hit. At one point, Hill claimed that Baker did not respond to this statement. Later, Hill said that Baker told her that she might have hit the vehicle, but was reluctant to tell Hill because she might become upset. Hill initially told Capt. Covey that, after her discussion with Capt. Whitfield, she called the Jackson Police Department and left a message so that she could correct her damage report. When pressed further, Hill eventually admitted that she did not call the Jackson Police Department because she did not believe that Baker hit her car, and she was being "selfish" and did not "want any more grief on [her]." Hill also gave varying statements on whether she saw damage to Baker's vehicle that corresponded with the damage to Hill's vehicle. Overall, Hill's answers to numerous inquiries changed to such an extent that the questions had to be posed to her repeatedly in an attempt to get clear, consistent answers, and even now it is difficult to discern a clear picture of Hill's account of the events on January 19, 2007 and thereafter. Under these

circumstances, we find that material evidence supports the administrative finding that Hill was guilty of violating the Departmental rule on Truthfulness.

In reviewing Hill's petition, we are required to review the record to determine whether any material evidence exists in the record to uphold the administrative decision. If any possible reason exists to justify the administrative decision, it must be upheld. *See McCallen*, 786 S.W.2d at 641; *Watts*, 606 S.W.2d at 277. Here, the City has demonstrated the existence of material evidence in the administrative record to uphold the findings that Hill violated the rules regarding Neglect of Duty and Truthfulness, which in turn justify the termination of her employment. Based on our view of the record as a whole, we conclude that the trial court's decision granting relief to Petitioner Hill must be reversed.

## CONCLUSION

The decision of the trial court is reversed, and the petition for writ of certiorari is dismissed. Costs on appeal are to be taxed to Appellee Stephanie D. Hill, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE